# COMPLAINT

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTTAWA

CODY BOONE, Personal Representative
for the Estate of JAMES KENNETH
BOONE, deceased,

      Plaintiff,

v

OTTAWA COUNTY CENTRAL DISPATCH
AUTHORITY, a Michigan governmental
agency, NICOLE JEAN WENTWORTH,
KATHERINE LEE COENEN, TRACY JO OOMEN,
PAULA SUE HOOKER, RYAN A. CULVER,
MEAGAN ANN ROSS, and MARY C. ALLMAN,
individually and in their official capacity,

      Defendants.

Case No.:  22- **7089** -NO

Hon.  **KAREN J. MIEDEMA**



FILED

NOV 2 9 2022

JUSTIN F. ROEBUCK
OTTAWA COUNTY CLERK/REGISTER
20th CIRCUIT COURT

DAVID P. SHAFER (P-53497)
Nolan & Shafer, PLC
Attorney for Plaintiff
40 Concord Avenue
Muskegon, MI 49442
231.722.2444
dpshafer@wemakeitright.com
mbelmonte@wemakeitright.com

There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in the complaint.

DAVID P. SHAFER (P-53497)

Plaintiff, CODY BOONE, Personal Representative for the Estate of JAMES

KENNETH BOONE, deceased, by and through his attorneys, Nolan & Shafer, PLC,

hereby complains against Defendants, OTTAWA COUNTY CENTRAL DISPATCH

AUTHORITY, NICOLE JEAN WENTWORTH, KATHERINE LEE COENEN, TRACY JO

OOMEN, PAULA SUE HOOKER, RYAN A. CULVER, MEAGAN ANN ROSS, and MARY CATHERINE ALLMAN, by stating as follows:

## **GENERAL ALLEGATIONS**

1.      At the time of the incident giving rise to this complaint, Plaintiff, Cody Boone ("Plaintiff), was a resident of the County of Ottawa, State of Michigan.

2.      At the time of the incident giving rise to this complaint, James Kenneth Boone ("James Boone"), was a resident of the County of Ottawa, State of Michigan.

3.      Plaintiff is a resident of the County of Ottawa, State of Michigan.

4.      Plaintiff has been appointed to serve as the Personal Representative for the Estate of James Kenneth Boone, deceased, in the Ottawa County Probate Court (Case No. 20-66227-DE).

5.      Defendant, Ottawa County Central Dispatch Authority ("OCCDA"), is a governmental agency organized and existing under the laws of the State of Michigan, with its principal office located in the County of Ottawa, State of Michigan.

6.      For the purpose of centralizing the dispatch of emergency police, fire and ambulance services within Ottawa County and the portions of the City of Holland located within Allegan County, Defendant-OCCDA was created through an Agreement drafted under the auspices of the Inter-Governmental Contracts Between Municipalities Act, MCL § 124.1 *et seq.*, the Urban Cooperation Act, MCL § 124.501 *et seq.*, and the Emergency Telephone Service Enabling Act, MCL § 484.1102 *et seq.*

7.      Under the direct supervision of an Administrative Policy Board, OCCDA is a legal entity separate and independent from the participating municipalities.

8.      At all relevant times, OCCDA was acting under color of law.

9.     Defendant, Nicole Jean Wentworth ("Wentworth"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Oceana, State of Michigan.

10.    At all relevant times Wentworth was acting under color of law.

11.    Defendant, Katherine Lee Coenen ("Coenen"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Ottawa, State of Michigan.

12.    At all relevant times Coenen was acting under color of law.

13.    Defendant, Tracy Jo Oomen ("Oomen"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Muskegon, State of Michigan.

14.    At all relevant times Oomen was acting under color of law.

15.    Defendant, Paula Sue Hooker ("Hooker"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Ottawa, State of Michigan.

16.    At all relevant times Hooker was acting under color of law.

17.    Defendant, Ryan A. Culver ("Culver"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Ottawa, State of Michigan.

18.    At all relevant times Culver was acting under color of law.

19.    Defendant, Meagan Ann Ross ("Ross"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Montcalm, State of Michigan.

20.    At all relevant times Ross was acting under color of law.

21.     Defendant, Mary Catherine Allman ("Allman"), at all relevant times was a 911/central dispatcher employed by OCCDA, and, upon information and belief, is a resident of the County of Ottawa, State of Michigan.

22.     At all relevant times Allman was acting under color of law.

23.     The incident giving rise to the instant complaint occurred within the County of Ottawa, State of Michigan.

24.     Pursuant to MCL § 600.1615 (actions against governmental units), venue is appropriate with this Court since OCCDA exercises its governmental authority and otherwise maintains its principal offices in the Ottawa County, Michigan.

25.     This court has proper jurisdiction over all of the listed parties, and the amount in controversy exceeds the sum of Twenty-Five Thousand Dollars and No/100ths ($25,000.00), exclusive of costs and interest.

## FACTUAL ALLEGATIONS

26.     On the morning of December 1, 2019, James Boone was present at his home located at 18674 Pawnee Drive, Spring Lake, MI 49456, along with his then 25-year-old son, Kenneth Boone, who was and is mentally ill and had a history of severe mood swings, violence, and threatening behavior; and he had recently been involuntarily hospitalized in November of 2019.

27.     Upon information and belief Kenneth Boone had also been convicted of multiple felonies and misdemeanors prior to December 1, 2019.

28.     At the time of these events, Kenneth Boone was prescribed Depakote and/or other drugs by his physicians to treat his mental illness and to stabilize or control his severe mood swings, but had recently stopped taking that medication.

29.     On December 1, 2019, at approximately 6:16 a.m., Wentworth was on duty as a 911 dispatcher/employee of OCCDA responsible for monitoring and

answering the 911 calls, when she received a call from 18674 Pawnee Drive, Spring

Lake, MI 49456.

30.     During this call, Wentworth initially heard from the son, Kenneth Boone,

who stated that he was not feeling safe with his dad and to "[c]ome arrest me," with

James Boone, in the background, trying to gain control of the phone and denying

conduct to make his son feel unsafe:

```
1                    File 140942:
2                    6:16 a.m.
3                    DISPATCH NICOLE WENTWORTH:  Ottawa County
4          911.
5                    KENNETH BOONE:  Hi, this is Kenneth
6          Boone.  I'm not feeling safe with my dad right now.
7                    JAMES BOONE:  Come on.
8                    KENNETH BOONE:  Come arrest me, 18674
9          Pawnee Drive.
```

31.     Kenneth Boone provided his address and stated that his dad was "not

acting like himself" and was scaring him.  Wentworth also heard from James Boone,

who denied that he was threatening or scaring his son:

```
13                   DISPATCH NICOLE WENTWORTH:  With your
14         dad?  What's going on there?
15                   KENNETH BOONE:  He's not acting like
16         himself.
17                   DISPATCH NICOLE WENTWORTH:  Your dad is,
18         or you aren't?
19                   KENNETH BOONE:  My dad isn't.
20                   DISPATCH NICOLE WENTWORTH:  Okay.
21         what's --
22                   KENNETH BOONE:  He's threatening me.
23                   JAMES BOONE:  No, I'm not.
24                   KENNETH BOONE:  He's scaring me.
25                   JAMES BOONE:  No, I'm not.
```

32. James Boone further advised Wentworth of the urgency of the situation and need for police assistance, as he was the one being threatened:

```
1              KENNETH BOONE:  You're scaring the fuck
2    out of me right now.
3              JAMES BOONE:  Ma'am, he's threatening me.
4    Will you hurry up?
5              DISPATCH NICOLE WENTWORTH:  Okay.  What
6    is your name?
7              JAMES BOONE:  James K. Boone.  He's
8    threatening me.
9              DISPATCH NICOLE WENTWORTH:  What is --
10   what is going on today?
```

33. James Boone was able to gain control of the phone/call from his son, and then James Boone specifically informed Wentworth that his son was "off his medications":

```
11             JAMES BOONE:  Let me talk to them.  Let
12   me talk to them, please.
13             Ma'am, he's off his medications because
14   it was messing up his liver.
15             DISPATCH NICOLE WENTWORTH:  Okay.  What
16   is your name?
17             JAMES BOONE:  James Boone.
```

34. James Boone then informed Wentworth that the medication his son was supposed to take—but he had ceased taking it—was Depakote, which was for his "mental illness."

```
21             DISPATCH NICOLE WENTWORTH:  Okay.  And
22   he's off of what medications?
23             JAMES BOONE:  Depakote.
24             DISPATCH NICOLE WENTWORTH:  What is that?
25   What is it for?

            CAROL L. GAVIGAN - CSR2494/RPR - 616-901-0781
```

```
1              JAMES BOONE:  Mental illness.
```

35.    Wentworth asked James Boone if there were any weapons in the home
and if anyone had been assaulted.  James Boone again expressed the urgency of the
dangerous situation by stating, "Not yet, no."

```
2               DISPATCH NICOLE WENTWORTH:  Okay.  Are
3          there any weapons in the home?
4               JAMES BOONE:  No.
5               DISPATCH NICOLE WENTWORTH:  Okay.  Has
6          anybody been physically assaulted?
7               JAMES BOONE:  Not yet, no.
```

36.    After receiving information regarding the full name and date of birth of his
son, Kenneth Boone, Wentworth provided James Boone with a sense of security that
police assistance would be there shortly and was further informed about the son's
potential of doing "something bad":

```
3               DISPATCH NICOLE WENTWORTH:  Okay.  Okay,
4          sir, I'm going to get an officer out that way for
5          you.  Why would you say that he wants to be arrested?
6               JAMES BOONE:  Because he knows that he
7          could do something bad to me.
```

37.    When asked what his son was doing in terms of making threats, James
Boone stated that his son woke him up in the middle of sleep to go get him a pack of
cigarettes and was then "starting to get in my face and double fist his fists":

```
8               DISPATCH NICOLE WENTWORTH:  Oh, okay.
9          And what is he making threats to do right now?
10               JAMES BOONE:  Nothing.  He woke me up in
11          the middle of sleep to go get him a pack of
12          cigarettes, and then he's starting to get in my face
13          and double fist his fists.
```

38.    Again, Wentworth provided James Boone with a sense of security that
police assistance would be there shortly:

```
20              DISPATCH NICOLE WENTWORTH:  Okay.  We're
21     going -- I guess we're going to get some -- some help
22     that way for you, okay?  I -- I just want you to stay
23     safe.  If anything changes before they arrive there,
24     I want you to call me back immediately, okay?
25              JAMES BOONE:  Yep, thanks.
```

CAROL L. GAVIGAN - CSR2494/RPR - 616-901-0781

39.    The initial call ended at 6:18 a.m.

40.    Despite twice providing James Boone with assurances that help/police would be "out that way," Wentworth took no further action whatsoever and a police unit was never properly and timely dispatched to the scene after the initial call.

41.    Upon information and belief, Culver, Hooker, Oomen, and Coenen were all present and involved in the decision-making process with respect to the initial call.

42.    Upon information and belief, and based on a review of the "Call for Service Detail Report – CFS 39," Ross and Allman were also present and participated in the decision-making with respect to the handling of the initial call.

43.    At 7:24 a.m., another 911 dispatcher, Ryan Culver ("Culver"), received a second call from 18674 Pawnee Drive, Spring Lake, MI 49456, from the son, Kenneth Boon, stating that he killed his father, James Boone, with a hammer:

```
7                       7:24 a.m.
8               DISPATCH RYAN CULVER:  Ottawa County 911.
9               KENNETH BOONE:  Hi, I fucking killed my
10     dad.
11              DISPATCH RYAN CULVER:  Who is this?
12              KENNETH BOONE:  Kenneth Boone.
13              DISPATCH RYAN CULVER:  Kenneth?  Kenneth,
14     what's going on there?
15              KENNETH BOONE:  Come look me up.
16              DISPATCH RYAN CULVER:  And you said you
17     killed your dad?
18              KENNETH BOONE:  Yes.
19              DISPATCH RYAN CULVER:  How did you do
20     that?
21              KENNETH BOONE:  A fucking hammer.
22              DISPATCH RYAN CULVER:  Okay, hold on just
23     a moment, Kenneth, I'm going to get some help started
24     that way for you.  Where are you at right now?
```

44.     After Culver asked about the location and condition of James Boone, and

if he thought James Boone was "beyond any help," the transcript of the second 911 call

reads:

```
1                    KENNETH BOONE:  I'm going to finish my
2          fucking dad off right now.
3                    DISPATCH RYAN CULVER:  What's that?
4                    KENNETH BOONE:  I'm going to kill my
5          fucking dad.
6                    DISPATCH RYAN CULVER:  Are you -- did you
7          say you are going to kill him, or you did kill him?
8                    KENNETH BOONE:  I'm going to right now.
9                    DISPATCH RYAN CULVER:  I want you to go
10         in another room.  I know you're upset right now.  Did
11         you say you hit him with a hammer?
12                   KENNETH BOONE:  Yep.
13                   DISPATCH RYAN CULVER:  Okay.  I want you
14         to go into another room.  Is he still breathing?
15                   (pause in call; very heavy breath)
16                   DISPATCH RYAN CULVER:  Kenneth?  Hello?
17                        7:27 a.m.
18         (At this point in the audio file any verbal
19         communication is blocked out and there is no ability
20         to transcribe and call logged off.)
21                        7:33 a.m.
22
```

45.     The second call ended at 7:27 a.m., after which Culver immediately

dispatched one or more police units and emergency personnel to the scene.

46.     During the second call, and at approximately 7:28 – 7:29 a.m. Hooker

states:

```
9                    OTTAWA DISPATCH:  We've got a mental, it
10         was a disturbance between him and his father earlier
11         this morning.  We've had the call holding for awhile.
12         He just called back to tell us that he assaulted his
13         father with a hammer and killed him.  We've got an
14         open line right now.  We can hear him hitting someone
15         or something with what we believe is the hammer.  We
16         can hear screaming in the background.
17                        7:29 a.m.
```

```
 21          OTTAWA DISPATCH:  For units responding to
 22     Pawnee Drive, update, Kenneth, our caller, is
 23     advising me is in the kitchen.  We can hear him
 24     hitting something or someone in the background.  We
 25     do hear a lot of screaming in the background.
```

47.    As deputies from the Ottawa County Sheriff's Office were rushing toward

the scene, Kenneth Boone was found walking down the road, in the neighborhood,

covered in blood and carrying the weapon used, a hammer.

```
  9          a number 23 jersey.  His hands are bloody.  He's got
 10     a hammer in his hand.
 11          DISPATCH MARY ALLMAN:  Suspect is walking
 12     toward 7041.  Got bloody hands with a hammer, 7:35.
 13
```

48.    After entering the home, James Boone was found bludgeoned to death on

the living room floor, laying in a supine position in a pool of blood with copious amounts

of blood spatter, skull fragments and brain matter surrounding his body.

49.    James Boone was bludgeoned so violently that he was unrecognizable.

50.    James Boone's body was subsequently transported to Spectrum Health in

Grand Rapids where an autopsy was performed by David A. Start, M.D., with the final

diagnosis being as follows:

**Final Diagnosis**
1. Multiple blunt force injuries
   a. Multiple (at least 32) lacerations of head and face with patterned lacerations of occipita
      scalp consistent with claw end of hammer
   b. Multiple skull and facial fractures, including maxilla and mandible, with comminuted fractures
      of anterior and middle cranial fossae
   c. Bilateral minimal acute subdural hemorrhage
   d. Acute subarachnoid hemorrhage
   e. Extensive fracture lacerations of bilateral frontal and temporal lobes of brain
   f. Bilateral fractures of greater cornua of hyoid bone
   g. Hemorrhage of superior and posterior/lateral soft tissue of right side of neck
   h. Irregular abrasions of medial shoulders, right side greater than left
   i. Fractures of medial right clavicle, and anterior right 1st and 2nd ribs
   j. Multiple linear abrasions of superior left chest
2. Multiple (10) stab wounds of right and left side of chest
   a. Stab wounds with characteristics of single edge knife
   b. Stab wound tracks (in aggregate) extend into chest/upper abdomen with injury to b lateral
      anterior ribs, pericardium, heart (4 full-thickness stab wounds through right and left ventricles),
      diaphragm, superior left lobe of liver, stomach and transverse colon
   c. Hemopericardium with minimal hemothoraces
   d. Wound tracks (in aggregate) extend front to back, medially and focally downward
3. Multiple (12) sharp force injuries of pubic region, penis, scrotum and medial right groin
   a. Stab wounds focally extend into subcutaneous soft tissue, and into scrotum with injury to
      right testis
   b. Sharp force injuries associated with minimal hemorrhage
4. 3 incised wounds of dorsal surface of right hand, consistent with defensive type wounds

51.     Kenneth Boone was charged with first-degree premeditated murder/fourth-degree habitual offender and pled "guilty but mentally ill" to that offense in September of 2021.

52.     Upon information and belief, Wentworth was never reasonably reprimanded and/or disciplined by the OCCDA for her failure to properly dispatch a police unit to the location of the call and continues to be employed as dispatcher for the OCCDA in Ottawa County.

53.     Upon information and belief, Coenen, Oomen, Hooker, Culver, Ross, and Allman, were never reasonably reprimanded and/or disciplined by the OCCDA for their individual and/or collective failure to properly dispatch a police unit to the scene of the call and continued to be employed as dispatchers/employees for the OCCDA in Ottawa County.

### COUNT – I
### 42 USC § 1983
### FOURTEENTH AMENDMENT – SUBSTANTIVE DUE PROCESS
### AGAINST INDIVIDUAL DEFENDANTS: WENTWORTH, COENEN, OOMEN, HOOKER, CULVER, ROSS AND ALLMAN

54.     Plaintiff, by reference, incorporates allegations 1 – 53 as though fully set forth herein.

55.     Properly dispatching police units to the scene of a 911 caller in response to threats of violence and/or potential crimes by mentally ill individuals are all normal functions of Wentworth, Coenen, Oomen, Hooker, Culver, Ross and Allman in their duties as 911 dispatchers/employees for the OCCDA.

56.     As 911 dispatchers/employees of the OCCDA and through Wentworth's personal contact with decedent, James Boone, on the morning of December 1, 2019, Wentworth, Coenen, Oomen, Hooker, Culver, Ross and Allman owed James Boone the following duties:

a. Duty to abide by the laws of the State of Michigan;

b. Duty to abide by all "clearly established law" arising under the Due Process Clause of the Fourteenth Amendment;

c. Duty to properly respond to 911 calls involving known threats of violence and calls for police assistance as required by Michigan law and federal law;

d. Duty to take threats of violence/bodily harm involving individuals with mental illnesses seriously;

e. Duty to properly prioritize and/or code 911 calls so that police assistance will be properly dispatched;

f. Duty to refrain from providing assurances to 911 callers that help/police will be sent when, in fact, a police unit was never dispatched following the initial call;

g. Duty to protect decedent, and others similar situated, from threats of violence from others when protection was promised;

h. Duty to act as a reasonable 911 dispatchers/employees under the same or similar circumstances;

i. Any and all other duties as determined during the course of the litigation of this matter.

57. Wentworth established a "special relationship" with James Boone in that,

on more than one occasion, Wentworth:

a. Assured James Boone that police assistance or help would be on its way to provide him with protection/assistance with respect to Kenneth Boone, during direct conversations with James Boone;

b. Knew that Kenneth Boone had made repeated threats of violence toward James Boone;

c. Knew that by not sending police units to either arrest Kenneth Boone or otherwise protect James Boone from Kenneth Boone, a convicted felon with mental health issues; and

d.    James Boone justifiably relied on Wentworth's assurances that police would be immediately sent to his location.

58.    By telling James Boone, on more than one occasion during the initial phone call, that she would be dispatching police or send "help out that way for you," but then failing to dispatch a police unit to the location, Wentworth provided James Boone with an illusory sense of security and endangered his life, and said failure caused James Boone's injuries and death.

59.    Wentworth was aware of facts from which the inference could reasonably be drawn that a substantial risk of serious harm existed, and drew this conclusion as evidenced by her assurances that she would send a police officer to the location of the call immediately.

60.    Wentworth's actions and/or omissions constituted a state created danger.

61.    Wentworth's actions and/or omissions reflected a deliberate indifference to the substantial risk of harm faced by James Boone.

62.    Wentworth's actions and omissions are conscious shocking.

63.    Wentworth violated James Boone's right to liberty, protected in the substantive component of the Due Process Clause under Fourteenth Amendment to the United States Constitution and the Michigan Constitution, Mich.Const.1963, Art. 1, § 17, which includes personal safety and the affirmative duty of dispatchers and police officers to act to protect James Boone, due to his special relationship with the police and/or dispatcher.

64.    Upon information and belief, Coenen, Oomen, Hooker, Culver, Ross and Allman, were present and privy to the circumstances of the initial call between Wentworth and James Boone, and as dispatchers/employees of the OCCDA they

established a special relationship with James Boone due to their knowledge of Wentworth's exchange with James Boone as set forth in paragraphs 57 - 63, above.

65.    As a direct and proximate cause of the above actions and/or omissions, James Boone was murdered and suffered conscious and severe pain and suffering, both physical and psychological, including the shock and fright, and the fear of impending murder, until the time of his death.

66.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman knew or should have known that their behavior (i.e. failure to properly dispatch police, which was promised) left James Boone without access to police assistance, and as such, could lead to serious injury and/or death.

67.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's conduct was a direct and proximate cause of the violation of James Boone's rights under the Fourteenth Amendment to the United States Constitution.

68.    As a direct and proximate result of the negligent and/or grossly negligent and/or intentional acts and/or omissions committed by Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman, James Boone suffered severe and horrific injuries and damages, including, but not limited to:

> a. Conscious physical and/or psychological pain and suffering of James Boone, which were caused by the serious and mortal injuries caused by the attack of his son, Kenneth Boone;
>
> b. Loss of wages, income, and/or financial support of any kind suffered by the Estate of James Kenneth Boone, deceased, and/or others;
>
> c. Funeral and burial expenses;
>
> d. Any other economic loss claims that may be pursued pursuant to Michigan law;

     e.     Mental anguish sustained by James Boone prior to his death;

     f.     Fright and shock sustained by James Boone prior to his death;

     g.     Embarrassment, humiliation, and/or mortification sustained by James Boone prior to his death;

     h.     Disability and/or disfigurement sustained by James Boone prior to his death;

     i.     James Boone sustained multiple horrendous injuries as a result of this incident, which caused his death;

     j.     Loss of society and companionship of those related to James Boone, including all of those entitled to make claims pursuant to the Michigan Wrongful Death Act, with the exception of Kenneth Boone, as set forth in MCL 600.2922;

     k.     Loss of financial support, services, and gifts that were provided by James Boone and/or other valuable gratuities, parental training and guidance, and any other damages allowed pursuant to Michigan law and sustained by decedent, decedent's surviving son, siblings, late mother's estate, and all other claimants entitled to make claims pursuant to MCL 600.2922;

     l.     Medical expenses, if any;

     m.     Exemplary damages;

     n.     Any and all other damages allowed pursuant to Michigan law that may be claimed as determined through the course of the litigation of this matter.

69.     Plaintiff's constitutional tort claims are actionable under 42 USC § 1983, which is the mechanism for enforcing rights under the Fourteenth Amendment of the United States Constitution.

70.     Plaintiff's damages for constitutional tort claims are compensable under 42 USC § 1988.

THEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgement in favor of Plaintiff and against Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman in an amount in excess of Twenty-five Thousand Dollars & 00/100 ($25,000.00), to which he is found to be otherwise entitled, together with interest, costs, and attorney fees, pursuant to 42 USC § 1988.

## COUNT – II
### 42 USC § 1983
### FAILURE TO TRAIN OR SUPERVISE
### AGAINST DEFENDANT OCCDA

71.     Plaintiff, by reference, incorporates allegations 1 – 70 as though fully set forth herein.

72.     The OCCDA is an Ottawa County governmental agency believed to be responsible for oversight, policy and procedure making, staffing, training, and rule enforcement regarding central dispatch staff acting in Ottawa County, Michigan, including specifically those dispatchers/employees taking and responding to calls and complaints related to threats of harm and potential crimes, including the dispatching of police to situations in which threats of harm and/or potential crimes may be occurring.

73.     As a governmental agency responsible for the operation of the 911 central dispatch system, the OCCDA owed James Boone the following duties:

        a.     Duty to abide by the law of the State of Michigan;

        b.     Duty to abide by all "clearly established law" arising under the Due Process Clause of the Fourteenth Amendment;

        c.     Duty to establish proper policies and procedures, or otherwise have protocols in place, related to the timely dispatch of police units in response to 911 calls involving known threats of violence by mentally ill individuals and requests for police assistance as required by Michigan law and federal law;

      d.      Duty to keep its policies, procedures and protocols updated to reflect "clearly established law" arising under the Due Process Clause of the Fourteenth Amendment in matters related to the timely dispatch of police units in response to 911 calls involving known threats of violence by mentally ill individuals and requests for police assistance as required by Michigan law and federal law;

      e.      Duty to properly hire, train, supervise, and discipline 911 dispatchers acting in Ottawa County under color of law;

      f.      Duty to respond to threats of violence and calls for police assistance as required by Michigan law;

      g.      Duty to protect James Boone, and others similarly situated, from threats of violence when protection is/was promised;

      h.      Duty to act as a reasonable governmental agency would act under the same or similar circumstances then and there existing; and

      i.      Any other duties that may be identified during the litigation of this matter.

74.    The OCCDA, by and through the actions and/or omissions of Wentworth, Coenen, Oomen, Hooker, Culver, Ross, Allman and/or others, breached its duties owed to James Boone in one or more of the following ways:

      a.      Failing to abide by the laws of the State of Michigan;

      b.      Failing to abide by all "clearly established law" arising under the Due Process Clause of the Fourteenth Amendment;

      c.      Failing to establish proper policies and procedures, or otherwise have protocols in place, related to the timely dispatch of police units in response to 911 calls involving known threats of violence by mentally ill individuals and requests for police assistance as required by Michigan law and federal law;

      d.      Failing to keep its policies, procedures and protocols updated to reflect "clearly established law" arising under the Due Process Clause of the Fourteenth

Amendment in matters related to the timely dispatch of police units in response to 911 calls involving known threats of violence by mentally ill individuals and requests for police assistance as required by Michigan law and federal law;

e. Failing to properly hire, train, supervise, and discipline 911 dispatchers acting in Ottawa County under color of law;

f. Failing to respond to threats of violence and calls for police assistance as required by Michigan law;

g. Failing to protect James Boone from threats of violence when protection was promised;

h. Failing to act as a reasonable governmental agency would act under the same or similar circumstances, then and there existing;

i. Failing to live up to its lawful obligations as may be discovered during the litigation of this matter.

75. Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's training was inadequate because failing to properly dispatch a police unit to the scene, during or immediately after the initial phone call, is clearly established as a violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

76. The OCCDA's failure to establish proper policies and/or procedures, or properly train, supervise and discipline 911 dispatchers, including Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman was likely to and did, in fact, cause a violation of James Boone's right to be free from deprivation of life or liberty without due process of law.

77. The OCCDA's failure to establish proper policies and/or procedures, or properly train, supervise and discipline 911 dispatchers/employees, including Wentworth, Coenen, Oomen, Hooker, Culver, Ross, Allman, and/or others was the result of a deliberate indifference to the constitutional protections of James Boone.

78.     The OCCDA's failure to establish proper policies and/or procedures, or properly train, supervise and discipline 911 dispatchers/employees, including Wentworth, Coenen, Oomen, Hooker, Culver, Ross, Allman, and/or others was the result of a deliberate indifference to the constitutional protections of James Boone.

79.     As a direct and proximate result of the OCCDA's failure to establish proper policies, procedures, or protocols, or to otherwise properly train, supervise or discipline Wentworth, Coenen, Oomen, Hooker, Culver, Ross, Allman and/or other employees of the OCCDA, James Boone suffered severe and horrific injuries and damages, including, but not limited to:

    a.    Conscious physical and/or psychological pain and suffering of James Boone, which were caused by the serious and mortal injuries caused by the attack of his son, Kenneth Boone;

    b.    Loss of wages, income, and/or financial support of any kind suffered by the Estate of James Kenneth Boone, deceased, and/or others;

    c.    Funeral and burial expenses;

    d.    Any other economic loss claims that may be pursued pursuant to Michigan law;

    e.    Mental anguish sustained by James Boone prior to his death;

    f.    Fright and shock sustained by James Boone prior to his death;

    g.    Embarrassment, humiliation, and/or mortification sustained by James Boone prior to his death;

    h.    Disability and/or disfigurement sustained by James Boone prior to his death;

    i.    James Boone sustained multiple horrendous injuries as a result of this incident, which caused his death;

    j.    Loss of society and companionship of those related to James Boone, including all of those entitled to make

claims pursuant to the Michigan Wrongful Death Act, with the exception of Kenneth Boone, as set forth in MCL 600.2922;

k.     Loss of financial support, services, and gifts that were provided by James Boone and/or other valuable gratuities, parental training and guidance, and any other damages allowed pursuant to Michigan law and sustained by decedent, decedent's surviving son, siblings, late mother's estate, and all other claimants entitled to make claims pursuant to MCL 600.2922;

l.     Medical expenses, if any;

m.     Exemplary damages;

n.     Any and all other damages allowed pursuant to Michigan law that may be claimed as determined through the course of the litigation of this matter.

THEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgement in favor of Plaintiff and against the OCCDA in an amount in excess of Twenty-five Thousand Dollars & 00/100 ($25,000.00), to which he is found to be otherwise entitled, together with interest, costs, and attorney fees, pursuant to 42 USC § 1988.

## COUNT – III
### GROSS NEGLIGENCE
### AGAINST INDIVIDUAL DEFENDANTS:  WENTWORTH, COENEN, OOMEN, HOOKER, CULVER, ROSS AND ALLMAN

80.     Plaintiff, by reference, incorporates allegations 1 – 79 as though fully set forth herein.

81.     At all relevant times, Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman were acting within the course of their employment as a 911 dispatcher or employee of the OCCDA and owed James Boone a duty not to act in a grossly negligent manner which is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

82.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman violated the duties owed to James Boone by failing to properly and timely dispatch a police unit to the location of the initial 911 call in response to James Boone's request for the same, in light of threats of violence by his mentally ill son.

83.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman demonstrated a substantial lack of concern for whether injury would occur to James Boone by assuring him that a police officer would be dispatched to the scene, and then failing to properly/timely dispatch a police unit.

84.    This failure caused a false expectation that help would be there shortly and that there was no need to look for assistance elsewhere.

85.    James Boone relied, to his detriment, on Wentworth's assurance that a police officer or help would be on the way to his home.

86.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman knew, or should have known, that failing to send a police officer to the location of the call could lead to a substantial risk of serious injury and/or death to James Boone.

87.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman consciously disregarded the substantial risk of harm to James Boone.

88.    Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's actions and/or omissions constitute "gross negligence," as contemplated by MCL § 691.1407.

89.    As a direct and proximate result of the grossly negligent acts and/or omissions committed by Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman, James Boone suffered severe and horrific injuries and damages, including, but not limited to:

a.    Conscious physical and/or psychological pain and suffering of James Boone, which were caused by the serious and mortal injuries caused by the attack of his son, Kenneth Boone;

b.    Loss of wages, income, and/or financial support of any kind suffered by the Estate of James Kenneth Boone, deceased, and/or others;

c.    Funeral and burial expenses;

d.    Any other economic loss claims that may be pursued pursuant to Michigan law;

e.    Mental anguish sustained by James Boone prior to his death;

f.    Fright and shock sustained by James Boone prior to his death;

g.    Embarrassment, humiliation, and/or mortification sustained by James Boone prior to his death;

h.    Disability and/or disfigurement sustained by James Boone prior to his death;

i.    James Boone sustained multiple horrendous injuries as a result of this incident, which caused his death;

j.    Loss of society and companionship of those related to James Boone, including all of those entitled to make claims pursuant to the Michigan Wrongful Death Act, with the exception of Kenneth Boone, as set forth in MCL 600.2922;

k.    Loss of financial support, services, and gifts that were provided by James Boone and/or other valuable gratuities, parental training and guidance, and any other damages allowed pursuant to Michigan law and sustained by decedent, decedent's surviving son, siblings, late mother's estate, and all other claimants entitled to make claims pursuant to MCL 600.2922;

l.    Medical expenses, if any;

m.    Exemplary damages;

n.    Any and all other damages allowed pursuant to Michigan law that may be claimed as determined through the course of the litigation of this matter.

THEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgement in favor of Plaintiff and against Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman, in an amount in excess of Twenty-five Thousand Dollars & 00/100 ($25,000.00), to which he is found to be otherwise entitled, together with interest, costs, and attorney fees, as permitted by law.

**COUNT – IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST INDIVIDUAL DEFENDANTS: WENTWORTH, COENEN, OOMEN,**
**HOOKER, CULVER, ROSS AND ALLMAN**

90.     Plaintiff, by reference, incorporates allegations 1 – 89 as though fully set forth herein.

91.     Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's conduct, as outlined above, was intentional.

92.     Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's conduct was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

93.     Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's conduct resulted in severe and serious emotional distress.

94.     Pursuant to MCL § 691.1407(3), Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman's intentional torts are not shielded by Michigan's governmental immunity statute.

95.     As a direct and proximate result of the grossly negligent acts and/or omissions committed by Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman, James Boone suffered severe and horrific injuries and damages, including, but not limited to:

    a.     Severe and serious emotional distress;

b. Conscious physical and/or psychological pain and suffering of James Boone, which were caused by the serious and mortal injuries caused by the attack of his son, Kenneth Boone;

c. Loss of wages, income, and/or financial support of any kind suffered by the Estate of James Kenneth Boone, deceased, and/or others;

d. Funeral and burial expenses;

e. Any other economic loss claims that may be pursued pursuant to Michigan law;

f. Mental anguish sustained by James Boone prior to his death;

g. Fright and shock sustained by James Boone prior to his death;

h. Embarrassment, humiliation, and/or mortification sustained by James Boone prior to his death;

i. Disability and/or disfigurement sustained by James Boone prior to his death;

j. James Boone sustained multiple horrendous injuries as a result of this incident, which caused his death;

k. Loss of society and companionship of those related to James Boone, including all of those entitled to make claims pursuant to the Michigan Wrongful Death Act, with the exception of Kenneth Boone, as set forth in MCL 600.2922;

l. Loss of financial support, services, and gifts that were provided by James Boone and/or other valuable gratuities, parental training and guidance, and any other damages allowed pursuant to Michigan law and sustained by decedent, decedent's surviving son, siblings, late mother's estate, and all other claimants entitled to make claims pursuant to MCL 600.2922;

m. Medical expenses, if any;

n. Exemplary damages;

o.     Any and all other damages allowed pursuant to
       Michigan law that may be claimed as determined
       through the course of the litigation of this matter.

THEREFORE, Plaintiff respectfully requests that this Honorable Court enter a

judgement in favor of Plaintiff and against Wentworth, Coenen, Oomen, Hooker, Culver,

Ross and/or Allman in an amount in excess of Twenty-five Thousand Dollars & 00/100

($25,000.00), to which he is found to be otherwise entitled, together with interest, costs,

and attorney fees, as permitted by law.

### COUNT – V
### WRONGFUL DEATH

96.     Plaintiff, by reference, incorporates allegations 1 – 95 as though fully set

forth herein.

97.     The wrongful acts and/or omissions, neglect, gross negligence and/or

fault, as outlined above, of the OCCDA, Wentworth, Coenen, Oomen, Hooker, Culver,

Ross and/or Allman as well as their agents/employees, was a direct and proximate

cause of the wrongful death of James Boone.

98.     This wrongful death claim is cognizable pursuant to MCL 600.2922.

99.     The Estate of James Kenneth Boone, deceased, incurred medical, funeral

and burial expenses for which the OCCDA, Wentworth, Coenen, Oomen, Hooker,

Culver, Ross and/or Allman are liable.

100.    As a direct and proximate result of the OCCDA, Wentworth, Coenen,

Oomen, Hooker, Culver, Ross and/or Allman's acts and/or omissions, as outlined

above, James Boone suffered severe and horrific injuries and damages, and the Estate

of James Kenneth Boone, deceased, and those entitled to bring claims pursuant to MCL

600.2922(3), sustained injuries and damages, which include, but are not limited to:

a.     Conscious physical and/or psychological pain and
       suffering of James Boone, which were caused by the

serious and mortal injuries caused by the attack of his
son, Kenneth Boone;

b.    Loss of wages, income, and/or financial support of
any kind suffered by the Estate of James Kenneth
Boone, deceased, and/or others;

c.    Funeral and burial expenses;

d.    Any other economic loss claims that may be pursued
pursuant to Michigan law;

e.    Mental anguish sustained by James Boone prior to
his death;

f.    Fright and shock sustained by James Boone prior to
his death;

g.    Embarrassment, humiliation, and/or mortification
sustained by James Boone prior to his death;

h.    Disability and/or disfigurement sustained by James
Boone prior to his death;

i.    James Boone sustained multiple horrendous injuries
as a result of this incident, which caused his death;

j.    Loss of society and companionship of those related to
James Boone, including all of those entitled to make
claims pursuant to the Michigan Wrongful Death Act,
with the exception of Kenneth Boone, as set forth in
MCL 600.2922(3);

k.    Loss of financial support, services, and gifts that were
provided by James Boone and/or other valuable
gratuities, parental training and guidance, and any
other damages allowed pursuant to Michigan law and
sustained by decedent, decedent's surviving son,
siblings, late mother's estate, and all other claimants
entitled to make claims pursuant to MCL 600.2922;

l.    Medical expenses, if any;

m.    Exemplary damages;

n.    Any and all other damages allowed pursuant to
Michigan law that may be claimed as determined
through the course of the litigation of this matter.

THEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgement in favor of Plaintiff and against the OCCDA, Wentworth, Coenen, Oomen, Hooker, Culver, Ross and/or Allman in an amount in excess of Twenty-five Thousand Dollars & 00/100 ($25,000.00), to which he is found to be otherwise entitled, together with interest, costs, and attorney fees permitted by law.

NOLAN & SHAFER, PLC

DAVID P. SHAFER (P-53497)
Attorney for Plaintiff
40 Concord Avenue
Muskegon, MI 49442
231.722.2444

Dated: November 29, 2022

## DEMAND FOR TRIAL BY JURY

Plaintiff, by and through his attorneys, Nolan & Shafer, PLC, hereby demands a trial by jury in the above-entitled cause.

NOLAN & SHAFER, PLC

DAVID P. SHAFER (P-53497)
Attorney for Plaintiff
40 Concord Avenue
Muskegon, MI 49442
231.722.2444

Dated: November 29, 2022